**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN MUSEUM OF NATURAL HISTORY,<br><br>                                    Plaintiff,<br><br>            v.<br><br>AFFILIATED FM INSURANCE COMPANY,<br><br>                                    Defendant. | 1:21-CV-07194 (GHW) (KHP)<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff American Museum of Natural History ("Plaintiff" or the "Museum"), by and through its undersigned attorneys, files this Amended Complaint against Defendant, Affiliated FM Insurance Company ("Defendant" or "AFM"), and alleges, upon knowledge with respect to its acts and upon information and belief as to other matters, as follows:

**NATURE OF THE ACTION**

1.      This is an insurance coverage action brought by the Museum against AFM, its insurance carrier, based on losses the Museum sustained as a result of business interruptions during the COVID-19 pandemic.

2.      Long before the pandemic, the Museum purchased business interruption insurance from Defendant, paying hundreds of thousands of dollars in annual premiums in exchange for an "all-risk" property insurance policy (the "Policy"). The purpose of business interruption insurance is to protect the insured against losses it experiences from the inability to continue its normal business operations.

3.      On March 13, 2020, the spread of the novel coronavirus SARS-CoV-2 into the Museum and nearby locations forced the Museum to close its doors, thereby depriving the Museum of much-needed revenue from visitor contributions and admissions.  Closed to the public for nearly six months, and then allowed to reopen only under greatly reduced capacity, the Museum has suffered severe financial losses during the pandemic.  The Museum lost millions of dollars as a result of its six-month closure, and it has continued to experience losses since its limited reopening.

4.      Shortly after its closure, the Museum gave notice to its insurer, Defendant, of its business interruption losses.  The Museum explained that COVID-19 had spread to the Museum and surrounding areas and that a number of Museum employees and contractors had tested positive for the virus.  The Museum timely sought coverage under the Policy for its business interruption losses.

5.      Weeks later, without performing any meaningful investigation into the nature of the Museum's losses, AFM indicated that it would deny coverage under nearly all of the Policy provisions invoked by the Museum.  Overlooking the evidence the Museum provided that the virus was present on its property and nearby locations—which presence directly resulted in a near-total loss of access to the property for a period of six months—AFM claimed that there was no "physical loss or damage" (as required under the Policy) and contended that the Policy's "contamination" exclusion precluded coverage, despite the exclusion's limited scope.  AFM hewed to a company-wide position that seeks to funnel all COVID-19 claims into two minor coverage provisions that provide, after a $100,000 deductible, for a maximum recovery of $200,000, a fraction of the Museum's losses.

6.      On April 1, 2021, AFM formally denied the Museum's claim.

7.      AFM has wrongfully denied coverage.  The presence of SARS-CoV-2 at the Museum, and the accompanying loss of essential functionality and physical access to the Museum's property, constitutes "physical loss or damage" under the Policy.  The contamination exclusion AFM relies upon is narrow, excluding only *costs* that are directly related to remedying onsite contamination at the Museum.  The Museum's losses are more extensive than such costs, and include lost ticket sales and other lost revenue caused by the Museum's months-long closure.

8.      AFM also attempts to avoid its coverage obligations by improperly relying on Policy provisions concerning communicable diseases.  But those provisions do not *limit* recovery for claims that *are* covered under the Policy; they provide an *extension* of coverage for losses that would *not* otherwise be covered.  Notably, these provisions do not contain any language stating that they provide the exclusive means of coverage for losses relating to communicable disease—language that *does* appear elsewhere in the Policy for other types of losses.  Because separate provisions of the Policy provide the Museum with coverage for general business interruption losses, the coverage sub-limits in the communicable disease extensions do not apply.

9.      AFM's failure to honor its obligations under the Policy has caused and continues to cause the Museum extreme financial hardship.

10.     The Museum seeks damages for its losses resulting from Defendant's breach of the Policy and a declaratory judgment that it is entitled to coverage under the Policy for its business interruption losses, up to the full policy limit.

## PARTIES

11.     Plaintiff is a New York-based non-profit organization located at 200 Central Park West, New York, New York, 20024.

12.     Defendant is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendant and the amount in controversy exceeds $75,000.

14.     Venue is proper in the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims occurred in the Southern District of New York, the Museum is situated in this district and Defendant regularly conducts business in this district.

## FACTS RELATING TO THE DISPUTE

### The Museum's Mission and Activities

15.     The Museum is one of New York City's most beloved non-profit institutions.  Since its founding in 1869, the Museum has advanced its mission, "[t]o discover, interpret, and disseminate—through scientific research and education— knowledge about human cultures, the natural world, and the universe."

16.     The Museum is a diverse scientific, educational and cultural organization, which includes approximately 200 full-time and world-renowned scientists; 45 permanent exhibition halls and several special exhibition gallery areas; the Richard Gilder Graduate School, which confers degrees of Doctor of Philosophy (Ph.D.) in

4

comparative biology and a Master of Arts in Teaching (MAT) in earth and planetary science; the Rose Center for Earth and Space, which houses the Hayden Planetarium; and one of the largest natural history libraries in the world.  Its collection contains over 34 million specimens of plants, animals, fossils, minerals, rocks, and human cultural artifacts, as well as specialized collections of frozen tissue and genomic data.  The Museum also has a major digital and online presence, and distributes its scientific and educational content, special exhibitions and planetarium shows to venues in approximately 25 countries.

17.     The Museum is one of the most visited museums in the world.  Before the pandemic, it exhibited its collections and disseminated information to an average of five million in-person visitors each year.  It also advances its mission by sponsoring scientific research, field expeditions and various educational initiatives.

18.     The Museum seeks to inspire students at a young age to pursue a career in science by sponsoring educational outreach to schools in New York City, like the Goddard Riverside Head Start Community Partnership, and through programs like its Science Research Mentorship Program, which is an opportunity for New York City students to participate in a one-year paid internship conducting scientific research.

19.     Further, the Museum has dedicated its resources to informing the public about the COVID-19 pandemic.  It has created a video series about the biology and social context of COVID-19, hosted events for the public, and published cutting-edge research from scientists in various disciplines on the disease and related topics.

20.     To undertake these ambitious scientific and educational efforts, the Museum relies in significant part on visitor contributions and admissions, and other revenue associated with the public's physical access to the Museum.

**The Policy**

21.     On June 30, 2019, in exchange for hundreds of thousands of dollars in annual premiums to be paid by the Museum, AFM issued the Policy, which the Museum subsequently renewed with substantially similar terms and certain modifications through June 30, 2021.  The Policy is attached as Exhibit 1.

22.     The Policy is an "all-risk" property insurance policy, meaning that it insures the Museum against all risks of physical loss or damage, except as specifically excluded by the Policy.

23.     AFM drafted the Policy and offered the Museum a limited opportunity to negotiate its terms.

24.     The Museum has timely paid all premiums required under the Policy.

25.     The Policy includes, in relevant part, (a) general business interruption coverage (the "General Business Interruption Coverage"); (b) an extension to the General Business Interruption Coverage where orders of civil or military authorities prohibit access to the Museum (the "Civil Authority Extension"); (c) an extension to the period of liability for the business interruption coverage in the event it takes longer to restore the insured's business to the condition that would have existed had no loss happened (the "Extended Period of Liability"); and (d) two discrete provisions that provide extensions to coverage for loss or damage resulting from a communicable disease (the "Communicable Disease Extensions")—one of which provides coverage for property

6

damage while the other provides coverage for business interruption losses. The business interruption losses for which the Museum seeks coverage through this action are covered under the General Business Interruption Coverage and the Civil Authority Extension, as extended by the Extended Period of Liability.

26.      The Policy provides up to $350,000,000 in coverage per occurrence, unless the Policy otherwise provides a sublimit for specific losses. There is no sublimit for the General Business Interruption Coverage or Civil Authority Extension. The initial Policy, covering the June 30, 2019 through June 30, 2020 period, included a sublimit of $100,000 for each Communicable Disease Extension (for a total of $200,000), which is subject to a combined $100,000 deductible, while the renewed Policy covers only $1,000 for the two Communicable Disease Extensions combined. Even this nominal $1,000 in coverage is subject to the $100,000 deductible.

**COVID-19**

27.      COVID-19 is an infectious disease caused by the recently discovered novel coronavirus SARS-CoV-2. The first confirmed case of COVID-19 in the United States occurred in January 2020.

28.      COVID-19 is highly contagious and has rapidly spread across the United States.

29.      When people infected with COVID-19 cough, sneeze, talk or breathe, they produce respiratory droplets carrying SARS-CoV-2.

30.      SARS-CoV-2 is a physical substance and a human pathogen, and can be present outside the human body in viral fluid particles.

31.      Although the viral droplets are smaller and less visible than rust, mold or paint, they are physical objects that can travel to other objects.

7

32.     COVID-19 infections can occur through exposure to respiratory droplets when a person is in close contact with someone who has the virus.  Infections can also occur through airborne transmission.  In fact, one human sneeze can expel droplets that can travel up to 27 feet at around one hundred miles per hour.

33.     Airborne transmission is much more likely to occur indoors.

34.     Respiratory droplets can also land on surfaces and objects.  These droplets physically alter the air and airspace in which they are present and the surfaces of both the real and personal property to which they attach.

35.     A person can contract COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose or eyes.  In the early stages of the pandemic, a number of authorities advised that surface transmission was a significant path for transmission of COVID-19.  For example, in February 2020, the World Health Organization issued guidance stating that COVID-19 could spread through infected surfaces, known as fomites.  Around the same time, the CDC issued similar guidance.  Although the CDC later concluded that the risk of surface transmission is low, it did not issue this updated guidance until April 2021.

36.     According to a study documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.

37.     In July 2020, the CDC published a study of a COVID-19 outbreak in an air-conditioned restaurant in which several diners from different families contracted COVID-19 after eating lunch at the restaurant.  Based on the authors' examination of the potential routes of transmission, the study concluded that "droplet transmission was

8

prompted by air-conditioned ventilation", leading the authors to recommend physical modifications to restaurants' seating and ventilation systems to prevent the spread of the virus in restaurants.

38.     Because COVID-19 physically affects the surface of property and the air in which it is present and can be transferred to individuals that come into contact with the surface or the air of the property, thereby causing additional infections, effective response to the pandemic required measures designed to reduce human-to-human and surface-to-human contact and increase internal ventilation systems.

39.     Some medical researchers have advised that high-frequency particulate air or other air filtration systems can be used to remediate the presence of COVID-19, indicating that physical alteration of the property may be necessary to render it safe from COVID-19 and return the property to a functional state.

40.     Likewise, the CDC has recognized the importance of heating, ventilation and air conditioning ("HVAC") improvements when reoccupying buildings. According to the CDC, "[p]rotective ventilation practices and interventions can reduce the airborne concentrations and reduce the overall viral dose to occupants." For that reason, the CDC has recommended that building owners and operators make various physical modifications to their HVAC systems to reduce exposure to the virus on their properties and the spread of COVID-19.

**COVID-19 Spreads to New York and the Museum**

41.     The first case of laboratory-confirmed COVID-19 in New York City occurred on February 29, 2020.

42.     On March 7, 2020, Governor Andrew M. Cuomo declared a state disaster emergency. Within that week, the World Health Organization categorized the

COVID-19 outbreak as a pandemic, Mayor Bill de Blasio declared a state of emergency in the City of New York, and President Donald J. Trump declared a national emergency.

43.     By March 12, 2020, there were around 650 confirmed cases of COVID-19 and 144 hospitalizations in New York City, including hospitalizations at the many hospitals within five miles of the Museum.

44.     The CDC estimates that the infection rates for COVID-19 likely have been ten times higher than reported, meaning that COVID-19 was much more widespread than the recorded numbers, including in New York City, which was hit particularly hard during the spring of 2020.

45.     SARS-CoV-2 was physically present in the Museum and within five miles of it, causing a loss of physical access and essential functionality. Accordingly, SARS-CoV-2 caused physical damage to property at and within five miles of the Museum.

46.     On March 12, 2020, Governor Cuomo issued Executive Order No. 202.1, which directed that any large gathering or event for which attendance is anticipated to be in excess of 500 people shall be canceled or postponed for a minimum of 30 days.  Executive Order No. 202.1 was issued in response to the presence of SARS-CoV-2 at properties throughout New York State, including on Museum premises and at locations within five miles of the Museum.  A copy of that order is attached as Exhibit 2.

47.     Around this time, several Museum employees and one contractor who were onsite developed COVID-19 symptoms and/or tested positive for COVID-19. For example, on March 13, 2020, an employee exhibited symptoms of COVID-19 while working onsite.  Another employee who worked onsite that same day later exhibited

COVID-19 symptoms and ultimately tested positive for COVID-19.  SARS-CoV-2 was, therefore, present at the Museum on surfaces and in the air no later than March 12, 2020, before the Museum formally closed its doors to the public.

48.     Starting in March 2020, the Museum spent significant sums of money on physical alterations to the premises, as well as cleaning and disinfecting its premises, totaling nearly $1.3 million in cleaning, health and safety expenditures over the course of several months.

49.     Among other things, the Museum upgraded its HVAC system, installed plexiglass barriers, hand sanitizer stations and path markers, changed air ventilation filters, closed and/or redesigned exhibits, and employed increased and comprehensive cleaning procedures.

50.     Despite its best efforts, however, the Museum could not fully eliminate the coronavirus from its premises.  At an institution like the Museum that welcomes roughly 10,000 visitors per day, SARS-CoV-2 does not just disappear on its own.  With daily average case rates skyrocketing in New York City in the spring of 2020, some number of the Museum's 10,000 daily visitors would have been virtually guaranteed to carry and transmit the virus—ensuring that the virus would have continued circulating had the Museum not shut its doors and implemented significant physical alterations to the premises, and related protocols.

51.     To the extent the Museum's cleaning efforts were effective at temporarily eliminating the virus from surfaces within the premises, there remained an ongoing risk that the virus would return if infected persons were permitted to enter the Museum—as in fact happened after the Museum first closed and a limited number of

employees and contractors were permitted to enter the premises.  Even the most thorough
cleaning efforts cannot eliminate the virus from the air, where respiratory droplets
containing the virus exhaled by an infected person can linger for hours inside buildings.
Accordingly, the optimal, safest and most effective way to eliminate all traces of the virus
was to close the Museum to visitors.

52.     SARS-CoV-2 caused physical loss and damage to the Museum's
property.  In response to the physical loss and damage to its property caused by SARS-
CoV-2 and to the civil orders issued by Governor Cuomo and Mayor de Blasio, the
Museum closed to the public starting on March 13, 2020—the first time it had closed its
doors to the public for a substantial period of time in its 150 year history.

53.     On March 16, 2020, Governor Cuomo issued Executive Order
No. 202.3 directing that gatherings were to be canceled if more than fifty people were
expected to be in attendance.

54.     Executive Order No. 202.3 was issued in response to the presence
of SARS-CoV-2 at properties throughout New York State, including on Museum
premises and at locations within five miles of the Museum.

55.     That same day, Mayor Bill de Blasio issued Executive Order 100,
which contained a similar directive.  Notably, Executive Order 100 indicated that the
shutdown was necessary in part "because the virus physically is causing property loss and
damage".  Shutdown orders across the country, including in California, Colorado,
Florida, North Carolina and Texas, have contained similar language.  The Executive
Order is attached hereto as Exhibit 3.

56.     The Acting Commissioner of the New York City Department of Cultural Affairs subsequently clarified that Executive Order 100 applies to museums.

57.     Executive Order 100 was issued in response to the presence of SARS-CoV-2 at properties throughout New York City, including on Museum premises and at locations within five miles of the Museum.

58.     Beginning on March 16, 2020, only a small number of designated Museum staff were permitted to work onsite.  The designated staff were limited to those essential to maintain the Museum—security personnel, custodial personnel, some facilities personnel, those employees who care for live animals, and a very small number of other designated staff.

59.     Despite the Museum's careful and thorough efforts to contain the virus through more intensive cleaning and other means, another employee who was onsite on March 16 and 17 later exhibited symptoms of COVID-19.  Further, on March 16, 2020, a contractor who was working onsite exhibited symptoms of COVID-19.  The contractor later tested positive for COVID-19.

60.     On March 20, 2020, Governor Cuomo ordered that all non-essential businesses statewide were to be closed effective on March 22, 2020.

61.     The civil orders issued by Governor Cuomo and Mayor de Blasio in March 2020 prohibited access to the Museum.

62.     The civil orders caused loss of physical access to the Museum's property and caused the Museum's property to lose its essential functionality.

63.     The next three months were characterized by exponential acceleration in the epidemic, resulting in approximately 203,000 cases and 18,600 deaths among persons with laboratory-confirmed COVID-19 in New York City.

64.     In New York City, hospital admissions rose, with a mean of 1,566 hospital admissions per day during the week of March 29, 2020.  Hospitalizations peaked on April 12, 2020, with a total of 12,184 patients hospitalized with COVID-19.

65.     On March 30, 2020, a field hospital was set up in Central Park—less than two miles from the Museum—to provide additional beds for COVID-19 patients.

66.     The Museum is in close proximity to numerous hospitals, including the field hospital located in Central Park, wherein thousands of COVID-19 patients were hospitalized.

**The Museum Suffers Significant Losses as a Result of Closing**

67.     The Museum was closed to the general public from March 13, 2020 until September 9, 2020, which caused significant monetary losses and severe financial hardship.

68.      While closed, the Museum was cut off from its major sources of revenue—admissions fees, retail sales, parking fees, food and beverage sales, and special events.  In total, the Museum suffered a loss of approximately $37 million in gross earnings and non-overlapping COVID-19-related expenses, as defined by the Policy, during the approximately six months it was closed.

69.     These losses are particularly catastrophic for the Museum because of its operating model.  While visitor contributions and admissions constitute a significant but variable revenue stream, the Museum's expenditures associated with

14

visitor services are primarily fixed costs.  Under normal circumstances the revenue generated by contributions and admissions exceeds the costs associated with visitor services.  To illustrate, in April 2019, the Museum received $5,237,841 from visitor contributions and admissions and spent $741,978 on visitor services.  But in April 2020 the Museum received nothing in visitor contributions and admissions, and in fact recorded a negative amount of $23,862 due to visitor refunds, while the cost of visitor services dropped only slightly to $615,970.

70.     The Museum's most significant operating expenses are long-term commitments that are primarily fixed costs, such as funding for scientific research and educational programming.  For example, in April 2019, the Museum's expenditures for scientific research and education were $3,132,383 and $2,662,014, respectively.  In April 2020, the Museum's expenditures for these programs were $2,807,626 and $1,980,633.  Accordingly, unlike other businesses whose costs may decrease if they suspend operations, the Museum's costs did not diminish in proportion with the loss of revenue caused by closing the Museum to the public.

**The Museum Suffers Physical Damage as a Result of COVID-19**

71.     The presence of large quantities of SARS-CoV-2 at the Museum made the premises uninhabitable and unusable, causing a distinct loss to its owner.  *See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (noting that under New York law and New Jersey law, "[w]hen the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner").

72.     This loss was "physical" because the presence of SARS-CoV-2 directly impaired the physical premises, forcing the Museum to close its doors and

undertake physical alterations to the facility in order to render the facility safe for its intended human use.  In this sense, the presence of SARS-CoV-2 at the Museum is analogous to the presence of aerosols and gases such as odors, smoke and ammonia in buildings, which courts have found can give rise to physical loss or damage.  These substances permeate buildings, similar to SARS-CoV-2, and require the replacement of physical objects or making structural changes to the property.   *See, e.g.*, *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 401, 404-06 (1st Cir. 2009) (odor that permeated building and may have caused some employees "headaches or other ill effects" could constitute "physical injury to tangible property"); *Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 15-CV-1932, 2016 WL 3267247, at *4-9 (D. Or. June 7, 2016) (holding "the smoke that infiltrated the theatre caused direct property loss or damage by causing the property to be uninhabitable and unusable for its intended purpose", and the loss or damage was "physical" because it was "not mental or emotional, nor is it theoretical"), *vacated on stipulation by the parties*, 2017 WL 1034203 (D. Or. Mar. 6, 2017); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.*, No. 12-CV-04418, 2014 WL 6675934, at *5-6 (D.N.J. Nov. 25, 2014) (holding that the accidental release of ammonia into a facility that caused its shutdown constituted physical loss or damage because "property can be physically damaged, without undergoing structural alteration, when it loses its essential functionality"); *see also Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 825-27 (3d Cir. 2005) (bacterial contamination in well water that rendered home unusable); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 708-10 (E.D. Va. 2010) (toxic gases that rendered home uninhabitable); *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. 01-CV-1362, 2002 WL 31495830, at *7-9 (D. Or.

June 18, 2002) (mold that rendered house uninhabitable); *Matzner v. Seaco Ins. Co.*, No.
CIV. A. 96-0498-B, 1998 WL 566658, at *3 (Mass. Super. Ct. Aug. 12, 1998) (carbon
monoxide in apartment building where fire department directed tenants to vacate);
*Sentinel Mgmt. Co. v. N.H. Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997)
(contamination by asbestos that created "a hazard to human health"); *W. Fire Ins. Co. v.
First Presbyterian Church*, 437 P.2d 52, 55-56 (Colo. 1968) (accumulation of gasoline
rendering building uninhabitable).

73.     In order to reopen, the Museum was forced to implement structural
changes to its premises. Due to the physical damage caused by the SARS-CoV-2 virus,
the Museum updated its HVAC system, changed ventilation filters, installed plexiglass
barriers at ticket counters, and added markers and hand sanitizer stations throughout its
premises.

74.     Despite the structural changes to the Museum and the constant
disinfecting and cleaning of the premises pursuant to CDC guidelines, the Museum was
forced to alter building features to prevent further physical damage to the Museum,
including:  turn off or cordon off interactive displays and other touchable exhibits; pause
entry into exhibition halls and theatres; temporarily close services and facilities where
physical interactions are prevalent, such as water fountains, food service, coat and bag
check and retail stores; limit elevator and restroom capacity; implement timed-entry
ticketing into the premises; enact strict social distancing protocols related to visitor
masking, spacing and capacity; and revamp its employee cafeteria to focus on pre-
packaged options and minimal contact.

75.     To further limit the transfer of aerosol deposits from persons to the Museum's surfaces and prevent further physical damage to the premises, staff at the Museum were directed to wear masks in all public areas and when physical distancing was not possible in non-public areas.  In addition, visitors above the age of two were mandated to wear facial coverings at all times and undergo temperature and vaccination checks prior to admission into the Museum.

**The Museum Gives Notice of Its Losses to AFM, and AFM Wrongfully Denies Coverage**

76.     On March 24, 2020, the Museum gave notice to AFM of its closure and losses, following up this notice with a written request for coverage under the Policy.

77.     In its written request for coverage, the Museum cited government mandates forcing the Museum to close and explained that "COVID-19 has permeated the Museum and its surrounding areas."  The Museum cited instances of Museum employees and contractors who had tested positive for the virus, "undoubtedly a reflection of countless more cases, as the Museum typically has thousands of employees, students and volunteers and over 10,000 visitors on the premises daily."  The Museum also noted that it "sits in the greatest hot-zone area (New York City) of documented COVID-19 cases in the United States with the widespread presence of COVID-19 in nearby hospitals, residential areas, and other institutions and locations."  Accordingly, the Museum demanded coverage under various provisions under the Policy, including the General Business Interruption Coverage and the Civil Authority Extension.

78.     On May 6, 2020, without doing any meaningful investigation into the Museum's claim, AFM indicated it would deny coverage under the General Business Interruption Coverage and Civil Authority Extension.  AFM asserted that the Museum

was only entitled to coverage under the Communicable Disease Extensions.  This would cap coverage at $200,000, a small fraction of the Museum's losses.

79.     Despite the evidence cited by the Museum that SARS-CoV-2 was physically present within the Museum, AFM asserted that "the Museum has not identified any physical loss or damage to its location", as required for coverage under General Business Interruption Coverage.  And although AFM acknowledged that COVID-19 was present at the Museum, AFM asserted that "[t]he presence of COVID-19 at an insured location does not constitute 'physical damage of the type insured'" under the Civil Authority Extension.  AFM also suggested that the Policy's Contamination Exclusion precludes coverage under both the General Business Interruption Coverage and the Civil Authority Extension.

80.     The Museum subsequently obtained an extension until March 1, 2021, to submit its proof of loss to AFM.

81.     On March 1, 2021, the Museum submitted its proof of loss to AFM.

82.     On April 1, 2021, AFM formally denied the Museum's claim for substantially the same reasons it initially indicated it would deny the Museum's claim, adding that "[t]o the extent that [the Museum] believes that their losses are the result of the inability to access and use their property because of the suspected or actual presence of COVID-19 and not from physical damage of the type insured, that too is specifically excluded" by an exclusion for "[l]oss of market or loss of use".  Instead, AFM agreed to pay the Museum only $200,000 under the Communicable Disease Extensions.

83.     AFM subsequently confirmed over email that it was denying coverage solely based on a purported lack of coverage under the Policy and not based on any technical deficiencies with respect to the proof of loss.

84.     AFM wrongly denied coverage under the Policy.

85.     *First*, the Museum's losses are covered under the Civil Authority Extension, found on pages 24-25 of the Policy, which provides:

> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

The term "location" is defined to include the Museum's main property at 79th Street & Central Park West in New York City, as well as certain other properties owned by the Museum.

86.     The Extended Period of Liability provision extends the Period of Liability for the Civil Authority Extension for up to 180 days.

87.     The shutdown orders issued by Governor Cuomo and Mayor de Blasio in March 2020 were the direct result of physical damage to property at the Museum and property within five miles of the Museum, triggering coverage under the Civil Authority Extension.

88.     Contrary to AFM's contention, the presence of SARS-CoV-2 at the Museum and nearby locations constitutes "physical damage" to property, and the relevant orders were issued in response to the presence of SARS-CoV-2 at properties throughout New York City and New York State, including the Museum and nearby locations.  This follows from the plain meaning of "physical damage".  SARS-CoV-2 is "physical"

20

because it has, in the words of one dictionary, a "material existence".  Unlike purely economic or immaterial harm, SARS-CoV-2 is a tangible virus that exists in the physical world and can be detected by the laws of natural science.  SARS-CoV-2 does "damage" to property because it alters the air and surfaces where it is present and causes the property to become dangerous and/or uninhabitable, losing its essential functionality and value due to the risk that humans will contract COVID-19.

89.     This understanding of the term "physical damage" is confirmed by other provisions of the Policy.  The separately applicable "Communicable Disease – Property Damage" provision expressly covers "property damage" caused by "communicable diseases", foreclosing AFM's argument that the physical presence of pathogens cannot give rise to "physical damage".  Additionally, the Policy expressly covers physical loss or damage to "electronic data" caused by *computer* viruses, implying coverage for physical damage to tangible property caused by actual viruses.  Indeed, Mayor de Blasio's Executive Order 100 expressly stated that it was necessary in part "because the virus physically is causing property loss and damage".

90.     *Second*, the Museum's losses are covered under the General Business Interruption Coverage, found on page 19 of the Policy, which provides:

> This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:
>
> 1.  To property as described elsewhere in this Policy and not otherwise excluded by this Policy;
>
> 2.  Used by the Insured;
>
> 3.  While at a **location** or while in transit as provided by this Policy; and

4. During the Period of Liability as described elsewhere in this Policy.

91.     The Extended Period of Liability provision extends the Period of Liability for the General Business Interruption coverage for up to 180 days.

92.     Even if the "physical damage" requirement under the Civil Authority Extension were not satisfied, the broader "physical *loss* or damage" requirement under the General Business Interruption Coverage is met.

93.     The disjunctive in the phrase "physical loss *or* damage" indicates that "loss" and "damage" have distinct meanings.  Otherwise, one of the two words would be superfluous.  It is well-settled that a contract is to be interpreted in a manner so that none of its words are rendered superfluous.

94.     That the use of "loss" means something other than "damage" is confirmed by the fact that the Civil Authority Extension requires only "physical damage".  The additional inclusion of "loss" in the General Business Interruption Coverage demonstrates that, whatever may be required to establish coverage under the Civil Authority Extension, the General Business Interruption Coverage is broader.

95.     Specifically, the term "physical loss or damage" includes both physical loss or damage caused by the presence of SARS-CoV-2 in the air and on surfaces at the Museum as well as physical loss or damage caused by the loss of physical access to the Museum and corresponding loss of essential functionality.  This loss of physical access and essential functionality was the direct result of the combined effect of the government shutdown orders and the physical presence of SARS-CoV-2 and COVID-19 at the Museum.

96.     Contrary to AFM's position, the Museum is not limited to coverage under the Communicable Disease Extensions, which provide extended (*i.e.* additional) coverage for property damage and business interruption losses where (i) there is "the actual not suspected presence of communicable disease"; and (ii) access is prohibited by a government agency regulating the presence of the communicable disease or, for property damage, by an officer of the insured as a result of the presence of the disease.  These extensions do not provide a *limit* on coverage for losses that are already covered under the General Business Interruption Coverage and Civil Authority Extension.  Rather, the Communicable Disease Extensions *extend* coverage for losses resulting from communicable diseases beyond what is covered under these provisions.

97.     That the Communicable Disease Extensions do not limit the coverage provided by other provisions in the Policy is confirmed by the absence of language providing that the Communicable Disease Extensions provide the *exclusive* coverage for losses covered by those Extensions.  Indeed, where a provision of the Policy is intended to have such exclusive effect, AFM inserted language expressly saying so.  For example, the "Data Service Provider – Business Interruption" extension incorporates language providing that "[c]overage provided in this Extension is excluded from coverage elsewhere in this Policy."  No such limiting language appears with respect to the Communicable Disease Extensions.  Thus, the Communicable Disease Extensions provide coverage of losses caused by SARS-CoV-2 in addition to that covered by other applicable provisions of the Policy.

98.     As noted above, the Museum's business interruption losses are separately covered by both the General Business Interruption Coverage and Civil

23

Authority Extension.  Accordingly, the Museum's losses are not limited to the coverage provided in the Communicable Disease Extensions.

99.     Moreover, the Contamination Exclusion, found on page 5 of the Policy, does not preclude coverage for all of the Museum's SARS-CoV-2 related losses. That is because this exclusion addresses only a very narrow and specific category of losses—*costs* associated with contamination, such as decontamination costs or costs associated with entering substitute business arrangements.

100.     The structure of the Policy makes clear that the Contamination Exclusion does not preclude coverage for the Museum's losses.  The Policy's exclusions are categorized into three "groups", each of which operate differently.  The "Group I" exclusions are preceded by a preamble that provides those exclusions apply to "loss or damage directly or indirectly caused by or resulting from any of the following".  This preamble ensures that Group I exclusions apply broadly, excluding all "loss or damage" resulting from the enumerated items.  The Contamination Exclusion, by contrast, is found in the "Group III" set of exclusions, which, unlike the other exclusions in the Policy, lacks a preamble setting forth how the exclusion applies.

101.     Unlike the Group I exclusions, the Contamination Exclusion does not exclude any and all *losses*.  Rather, the Contamination Exclusion only explicitly refers to *costs* due to contamination.  This distinction is important because the Policy expressly covers "losses", including business interruption losses, and uses that term differently from the term "costs".  For example, the Policy expressly defines business interruption "loss" to include "Gross Earnings", which is in turn defined to *exclude*

certain "cost[s]".  Likewise, business interruption coverage for Gross Profits includes "actual loss", defined as the reduction in sales and the increased cost of doing business.

102.    This interpretation of the Contamination Exclusion is bolstered by the distinction between "losses" and "costs" made elsewhere in the Policy.  Specifically, the Communicable Disease coverage for property damage insures only "reasonable and necessary *costs* incurred by the Insured", such as costs of cleaning up the communicable disease or paying a public relations firm for reputation management.  In contrast, other exclusions explicitly exclude *losses*, such as "loss or damage resulting from the voluntary parting with title or possession of property", "[l]oss or damage or deterioration arising from any delay" and "loss or damage to personal property in the open from rain, sleet, snow, sand or dust".  The Policy, therefore, carefully distinguishes between "costs" and "losses" when defining coverages or exclusions.

103.    The Policy's distinction between costs and losses indicates that these terms have distinct meanings.  Costs refer to out-of-pocket expenses and outlays such as those that might appear on a statement of income and expenditures, whereas, in the context of business interruption insurance, losses include a failure to obtain an expected benefit, such as revenue.

104.    The limited scope of the Contamination Exclusion is also apparent when compared to the industry standard language for a virus exclusion (the "Industry Standard Virus Exclusion") or the version of the Contamination Exclusion that appears in the Washington State version of AFM's policy (the "Washington Contamination Exclusion").

105.    In 2006, the Insurance Services Organization, which drafts standard policy language for use in insurance contracts, introduced a new endorsement, CP 01 40 07 06.  The Industry Standard Virus Exclusion contains broad and sweeping language that precludes any and all "*loss or damage* caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducting physical distress, illness or disease" (emphasis added).

106.    Likewise, the Washington Contamination Exclusion, as set forth in the amendatory endorsement to AFM's standard form policy for insured locations in the State of Washington, reworks the policy's exclusions by placing the Contamination Exclusion in a different group (Group II instead of Group III) and amending Group II's preamble such that the policy "excludes *loss or damage* caused by" contamination (emphasis added).

107.    AFM did not adopt the Industry Standard Virus Exclusion, the Washington Contamination Exclusion, or similarly broad language, and instead opted only to explicitly exclude costs associated with contamination.  Accordingly, the Contamination Exclusion only excludes direct out-of-pocket costs relating to contamination, such as cleanup costs or the costs of temporarily relocating while the property is decontaminated, rather than all economic losses that may arise as a result of contamination.

108.    The limited scope of the Contamination Exclusion is further confirmed by the absence in the Policy of an "anti-concurrent causation" clause—a provision that specifies that a loss is not covered when it is the result of more than one peril and at least one of the perils is subject to a policy exclusion.  If the Contamination

Exclusion were intended to have such effect, then it would contain a provision excluding coverage for any losses occurring as a result of a virus even if the virus only indirectly or partially contributed to the loss.  But the Contamination Exclusion is found in the "Group III" set of exclusions, which *lacks any* anti-concurrent causation clause.

109.    In contrast, other exclusions in the Policy contain an anti-concurrent cause exclusion.  In addition to expressly covering "loss or damage", the "Group I" exclusions, through operation of their preamble, apply to losses "directly or indirectly" caused by the excluded item "regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss or damage".  This language ensures that Group I exclusions apply broadly, covering all "loss or damage" even if it is only "indirectly" caused by the excluded item and even if some other causes contributes concurrently to the loss or damage.

110.    Because other exclusions in the Policy include an anti-concurrent causation clause, AFM was aware of such a clause and intentionally did not include it in the Contamination Exclusion when drafting the Policy.  This evidences an intent that the Contamination Exclusion was meant to be a narrow exclusion, precluding coverage in a narrow set of circumstances, rather than excluding coverage for any and all losses, even those only partially or indirectly caused by a virus.

111.    The absence of an anti-concurrent causation clause is particularly notable here because the Museum's business interruption losses resulted from *both* the presence of SARS-CoV-2 and the government shutdown orders—two concurrent causes—and the immediate cause of the Museum's lost revenue was the closure of the Museum, not "contamination" of its property.  Even if the Museum were able to take

27

safety precautions to remove the virus from the premises, the Museum would be unable to reopen until the relevant government orders expired or were rescinded and it became safe to reopen. Accordingly, the Museum's losses were not the direct and sole result of "contamination" and are, therefore, not excluded under the Policy.

112.    Nor does the vaguely worded exclusion for "[l]oss of market or loss of use", which AFM asserted for the first time in its April 1, 2021 denial of coverage, bar the Museum's claim. "Loss of market" exclusions are intended to preclude coverage for losses resulting from ordinary business risks associated with the operation of market forces (*e.g.*, a loss in demand due to shifting consumer tastes or increased competition), not to preclude coverage for business interruption losses arising from physical loss or damage. The Museum does not claim losses resulting from ordinary business risks; it claims losses resulting from its unprecedented six-month closure necessitated by the presence of SARS-CoV-2 at the Museum and nearby locations. Accordingly, the "loss of market" exclusion does not bar coverage for the Museum's business interruption losses.

113.    Likewise, "loss of use" exclusions are not intended to preclude coverage for business interruption losses resulting from physical loss or damage, such as the presence of SARS-CoV-2 at the Museum. Otherwise, the entire purpose of business interruption coverage would be defeated, as all business interruption losses result from "loss of use" in some sense—the insured's business is interrupted because the insured cannot fully "use" its property due to some physical event that has affected the property (*e.g.*, a hurricane that has prevented access to the property, requiring the business to shut down for some period). The "loss of use" exclusion therefore does not apply to the Museum's business interruption losses.

**Rule 11 Certification**

114.    Counsel for Plaintiff certifies that to the best of counsel's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, this Amended Complaint is not being presented for any improper purpose, such as to harass, cause unnecessary delay or needlessly increase the cost of litigation.

115.    On February 4, 2022, Plaintiff communicated to Defendant's counsel the following offer:  "In light of the number of cases concerning business interruption insurance coverage for COVID losses that are currently pending before New York's intermediate appellate courts, and the likelihood that the New York Court of Appeals will correct or modify New York law as it is currently interpreted by the Second Circuit, Plaintiff proposes that the parties execute a routine tolling agreement.  Such an agreement will permit Plaintiff to dismiss its claim without prejudice so that the parties can wait and assess how the law in this area is ultimately resolved by the New York state courts."

116.    The tolling agreement proposed by Plaintiff would have permitted Plaintiff to preserve its claim in the event of a subsequent change in New York law, while simultaneously permitting the parties to discontinue the present suit and avoid any burden or cost associated with it.

117.    Counsel for Defendant responded as follows:  "This is in response to your email of this date requesting that Affiliated FM enter into a tolling agreement with the American Museum of Natural History.  Courts applying New York law, including the Second Circuit, have unanimously dismissed claims like plaintiff's for business interruption coverage arising from the COVID-19 pandemic.  We do not believe

that the New York Court of Appeals will issue a ruling inconsistent with this body of case law and thus are not amenable to entering into a tolling agreement."

118.    Counsel for Plaintiff certifies that to the best of counsel's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the claims, defenses and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law or for establishing new law.

119.    The New York cases that have denied business interruption coverage for losses caused by COVID have relied primarily on *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1 (1st Dep't 2002).  The policy at issue in *Roundabout Theatre* covered (a) losses "incur[ed] in the event of interruption, postponement or cancellation of an Insured Production *as a direct and sole result of* loss of, damage to, or destruction of property or facilities" (b) *caused by* "*direct* physical loss or damage to the [insured's] property".  *Id.* at 3 (emphasis omitted).  The insured in *Roundabout Theatre* argued that these policy terms covered closures and cancellations that the insured theater was forced to undertake as a result of "off-site property damage" resulting from a construction accident on the same street as the insured.  *Id.* at 4.

120.    "Reading these [policy] provisions together", the Appellate Division, First Department concluded that "the business interruption coverage is limited to losses involving physical damage to the insured's property".  *Id.* at 7.  It emphasized that the use of the word "direct" in connection with "physical" "narrow[ed] the scope of coverage and mandate the conclusion that losses resulting from off-site property damage do not constitute covered perils under the policy".  *Id.*

121.    Unlike the policy in *Roundabout Theatre*, the Museum's policy is not restricted to injuries that are a "*direct and sole* result of loss of, damage to, or destruction of property" caused by "*direct* physical loss or damage".  *Id.* at 3.  The Museum's policy by its terms "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE".  That language is plainly intended to be broader than the policy in *Roundabout Theatre*.

122.    Moreover, the harm to the Museum from SARS-CoV-2 was not the "direct and sole" result of "off-site property damage", as in *Roundabout Theatre*.  *Id.* at 4.  It was caused at least in part by the actual physical presence of SARS-CoV-2 on the Museum's premises, which directly rendered the facility unusable for its intended purpose, and forced the Museum to make physical alterations.  This constituted a direct physical loss or damage of the sort not present in *Roundabout Theatre*.

123.    Applying *Roundabout Theatre* to preclude coverage in a policy that does not include the terms "direct" and "sole", and in factual circumstances that *did* involve a direct physical impact to the covered property, would be an unwarranted extension of *Roundabout Theatre*.

124.    At present, "many cases raising the same issue are percolating through the New York state court system, and nine such cases are currently pending before New York's intermediate courts of appeals. . . .  Thus, the Court of Appeals will have every opportunity to address this question and either endorse or correct" the interpretation that the New York state and federal courts have thus far given to *Roundabout Theatre*.  *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 224-25 (2d Cir. 2021).

31

125.    The physical loss and damage caused to the Museum is similar to cases where courts have held or stated in dictum that the combined effect of government orders and the actual presence of SARS-CoV-2 at the insured's premises was or would be sufficient to satisfy the physical loss or damage requirement.  *See Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800-03 (W.D. Mo. 2020); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 487 F. Supp. 3d 834, 841 n.7 (N.D. Cal. 2020), *aff'd*, 15 F.4th 885 (9th Cir. 2021); *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F. Supp. 3d 867, 873-74 (W.D. Mo. 2020).

126.    On January 28, 2022, the Second Circuit issued a non-precedential summary order in *Kim-Chee LLC v. Philadelphia Indemnity Insurance Company*, No. 21-1082-CV, 2022 WL 258569, at *2 (2d Cir. Jan. 28, 2022).  The insured in *Kim-Chee* had alleged that SARS-CoV-2 "was present at, in, throughout, and on [the insured's] Premises".  *Id.* at 2.  The Second Circuit observed that, "[e]ven assuming the virus's presence at Kim-Chee's tae-kwon-do studio, the complaint does not allege that any part of its building or anything within it was damaged—let alone to the point of repair, replacement, or total loss.  Nor does Kim-Chee explain how, other than by the denial of access, any of its property could no longer serve its insured function."  *Id.*  In the absence of any such factual allegations, the Second Circuit concluded that "the virus's inability to physically alter or persistently contaminate property differentiates it from radiation, chemical dust, gas, asbestos, and other contaminants whose presence could trigger coverage under Kim-Chee's policy".  *Id.*  The Second Circuit noted that "to survive dismissal, Kim-Chee's complaint must plausibly allege that the virus itself inflicted 'actual physical loss of or damage to' property."  *Id.* at 1.

127.    Unlike the appellant in *Kim-Chee*, Plaintiff has alleged specific facts demonstrating that the virus inflicted actual physical loss and damage to the Museum.  Plaintiff has, moreover, alleged specific facts demonstrating that the virus's presence at the Museum was persistent and caused the Museum to make physical alterations to the premises.

128.    Counsel for Plaintiff certifies that to the best of counsel's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## COUNT I:  DECLARATORY JUDGMENT

129.    Plaintiff adopts and re-alleges paragraphs 1 through 128 above.

130.    Plaintiff's Policy is an insurance contract under which Defendant was paid premiums in exchange for promises to pay Plaintiff's losses for claims covered by the Policy.

131.    Pursuant to the terms of the Policy, Defendant is obligated to pay for the Museum's business interruption losses up to the full policy limit.

132.    Defendant disputes its legal obligation to pay Plaintiff's claims.

133.    An actionable and justiciable controversy exists concerning the proper construction of the Policy and the rights and obligations of the parties thereto, with respect to the Museum's claim for expenses or losses arising during the COVID-19 pandemic.

## COUNT II: BREACH OF CONTRACT

134.    Plaintiff adopts and re-alleges paragraphs 1 through 128 above.

135.    The Policy constitutes a valid and enforceable contract between the Museum and AFM.

136.    The Museum performed all of its obligations under the Policy by timely paying its premiums and providing prompt notice of its losses to AFM.

137.    AFM breached its contract by denying Plaintiff's claim to the full extent required by the Policy.

138.    The Museum sustained losses because Defendant failed to honor its obligations and pay the Museum's claim for business interruption losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.    The Court enter judgment in favor of Plaintiff and against Defendant declaring that the Museum's losses are covered under the General Business Interruption Coverage, the Civil Authority Extension, the Extended Period of Liability and all related coverages and extensions, and that Defendant is required to pay the Museum for its claim, up to the full limit of the Policy, for claimed amounts under the Policy;

B.    Awarding Plaintiff damages in an amount to be determined at trial, plus pre- and post-judgment interest to the extent permitted by law;

C.    Awarding Plaintiff attorneys' fees, cost and disbursement incurred as a result of this action; and

D.    Granting Plaintiff such other and further relief as the Court deems just and proper.

February 24, 2022

CRAVATH, SWAINE & MOORE LLP,

by  */s/ Keith R. Hummel*

_____

Keith R. Hummel
Justin C. Clarke

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff American Museum of Natural History*